**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **No. 3:24cr193** |
| | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **MATTHEW RONK,** | : | |
| **Defendant** | : | |

## MEMORANDUM

Defendant Matthew Ronk stands accused of attempting to knowingly persuade, induce, entice, or coerce a minor to engage in illegal sexual activity in violation of 18 U.S.C. § 2422(b).  Additionally, the government contends that Ronk attempted to transfer sexually explicit material to that child in violation of 18 U.S.C. § 1470.  Defendant also allegedly crossed state lines with the intent to engage in illicit sexual conduct with the minor. The government thus advances that Ronk violated 18 U.S.C. § 2423(b).

According to the indictment in this case, Ronk is required by law to register as a sex offender due to a prior conviction.  Consequently, Ronk has also been charged with three counts of violating 18 U.S.C. § 2260A, a separate federal recidivism statute applicable to registered sex offenders.  Section 2260A provides for a mandatory 10-year prison sentence to be imposed in addition to —

and served consecutively to – any other prison sentence imposed for committing an underlying felony offense "involving a minor." 18 U.S.C. § 2260A.

Following his indictment, Ronk filed two pretrial motions.  As addressed first, Ronk's arrest played out in a manner calling back, in some respects, to NBC's "To Catch a Predator" series, including the use of a sting house and the surprise reveal of arresting officers when the defendant opened the door.  The arresting officers also did not immediately advise Ronk of his Constitutional rights.  Based on these circumstances, Ronk now seeks to suppress his post-arrest statements under Miranda v. Arizona, 384 U.S. 436. (Doc. 38).  The arresting officers did not ask Ronk any interrogative questions or say much to the defendant at all.  Ronk thus relies on Rhode Island v. Innis, 446 U.S. 291 (1980) to argue that the officers subjected him to the functional equivalent of interrogation by their words and actions once they took him into custody.

As addressed second, Ronk's situation involves an internet sex sting operation and, according to the government, the defendant has been convicted of sex crimes with a minor victim before.  Defendant thus faces decades of additional imprisonment if convicted of the three charges under 18 U.S.C. § 2260A.  Ronk did not chat with an actual minor in this case, only an undercover officer.  A district court decision from a sister jurisdiction has determined that Section 2260A does not apply when the underlying crimes involve a fictional

2

minor.  Ronk thus moves to dismiss the offenses under Federal Rule of Criminal Procedure 12(b)(3)(B)(v), relying upon the district court decision. (Doc. 36).

The motion to suppress requires a detailed review of the factual circumstances of the Ronk's arrest, while defendant's motion to dismiss poses a purely legal question.  Accordingly, the court begins with the motion to suppress.

### *Defendant's Motion to Suppress*

Ronk's motion to suppress challenges the arrest tactics used at the culmination of an internet sting operation.  According to the government, an undercover officer went online and impersonated a mother offering her minor daughter for sexual encounters.  Defendant allegedly messaged the undercover agent and exchanged communications with the agent for a few weeks.  Then, Ronk ostensibly made plans to meet the mother and minor daughter in person.  In turn, the undercover officer made plans to arrest the defendant, using a tactical arrest team set up inside a vacant townhouse in a residential neighborhood.   The officers on the arrest team were instructed or were under the impression that they were not to ask the defendant questions.  Thus, the officers did not provide Ronk with Miranda warnings upon arrest or even after the defendant began making incriminating statements.  Ronk argues that, given the manner of arrest, he should have been Mirandized immediately upon being taken

3

into custody.  Because he was not, Ronk moves for suppression of the statements he made to the team of arresting officers.

**Background**

On July 30, 2024, a grand jury sitting in the Middle District of Pennsylvania returned a six-count indictment against the defendant based on conduct between April 27, 2024 and May 11, 2024. (Doc. 1).  Ronk is charged with the 18 U.S.C. § 2422(b) offense in Count 1 for attempted online enticement. Count 2 alleges that Ronk violated 18 U.S.C. § 1470 by attempting to transfer obscene materials to a minor.  Count 3 involves the offense of travelling across state lines to engage in illicit conduct with a minor under 18 U.S.C. § 2423(b).  Finally, Ronk faces three counts of violating 18 U.S.C. § 2260A, which are addressed more fully in the second portion of this memorandum.

As for the attempted online enticement offense in Count 1, "[p]rosecutions under 18 U.S.C. § 2422(b) ordinarily are the result of sting operations." United States v. Howard, 766 F.3d 414, 420 (5th Cir. 2014).  "The statute applies whether the minors are real or fictional, as in the 'To Catch a Predator' scenario." United States v. Eller, 57 F.4th 1117, 1121 (9th Cir. 2023); see also United States v. Tykarsky, 446 F.3d 458, 469 (3d Cir. 2006) (citations omitted) (conviction under the attempt provision of § 2422(b) does not require the involvement of an actual minor).  As for the offense in Count 3, interstate travel

4

for an illicit purpose, "[t]he actual age of the intended victim is not an element of the offense[,]" and "it "makes no difference that an actual minor was not involved." Tykarsky, 446 F.3d at 469 (citation and quotation marks omitted).

### 1. The Investigation

The above charges stem from an undercover investigation led by Officer Robert Vojtko of the Kingston Township Police Department in Luzerne County, Pennsylvania.  (See generally Doc. 39, Def. Br. in Supp.).  As advanced by the government, Ronk travelled from Hancock, New York to a residence in Kingston Township to meet "Lindsay," a "13-year-old girl," and to engage in sexual acts with her. [1] (Doc. 43, Br. in Opp. at 3).  "Lindsay," however, was portrayed by Officer Vojtko, as was her mother, "Tara." Id.  According to the government, Ronk messaged "Tara" using an online platform for personal ads. Id. at 3–4.   "Tara" advised Ronk that the ad was really for "Lindsay," her minor child. Id.  Ronk allegedly messaged back with an interest in engaging in sex acts with "Lindsay." Id. at 3–4.  Based on the indictment, it appears the government will assert that

---

[1] Defendant only admits that he was arrested "after he entered a home to meet an undercover law enforcement officer posing as the mother of a fictional minor inside of the home." (Doc. 38, Mot. to Suppress ¶ 3).  In this section, the court refers to information advanced in the government's brief only to provide the articulated reasons for defendant's prosecution.  The references to "facts" in the government's briefing are unproven.  They do not constitute findings of fact by the court relative to defendant's motion to suppress.  The undercover officer, Robert Vojtko, appeared at the suppression hearing at the government's counsel table, but did not testify.

Ronk and Officer Vojtko a/k/a "Tara," communicated online for several weeks before the two discussed meeting in person. (Id. at 1).   The indictment also alleges that Ronk attempted to send the minor obscene material on May 3, 2024, approximately one week before his arrest. (Doc. 1 at 2).

### 2. Planning the Arrest

As the investigation progressed, Officer Vojtko met with other members of the Kingston Township Police Department to plan Ronk's arrest on a prearranged meet-up date, May 11, 2024.[2] (See Doc. 51, H.T. at 21:4–22:25). According to the government's witnesses, Vojtko led the planning meeting. Id. at 23:1-2.  Pursuant to the plan, officers would use a residence within the municipal police department's jurisdiction for the arrest. See id. at 8:6-8.  Four members of the township police department would wait in the residence to take Ronk into custody: Officer Jeffrey Carter, Sergeant John Fuches, Sergeant Michael Hunzinger, and Chief of Police Martin Maransky. Id. at 7-19:24, 8:12-14.   The plan called for Officer Vojtko to monitor nearby roads for Ronk's arrival at the residence and not be a part of the arrest team. Id. at 11:13-20.

---

[2] These facts are derived from the testimony of Officer Jeffrey Carter and Sergeant Michael Huntzinger during the suppression hearing on August 7, 2025, (Doc. 51, Hearing Transcript ("H.T.")), and the video footage captured by those respective officers' body-worn cameras, (Docs. 44, 49, Gov. Ex. 1, ("Carter BWC"), Gov. Ex. 2, ("Huntzinger BWC")). In his motion papers, Ronk refers to footage captured by the body-worn cameras of Sergeant John Fuches and Officer Sam Van Horn of the Kingston Township police. (Doc. 39, Def. Br. in Supp. Mot. to Suppress at 2).  Neither side has supplied Fuches or Van Horn's footage for the court's review.

The plan also called for Officer Vojtko, as the undercover investigating agent, to provide Ronk with his <u>Miranda</u> warnings and conduct a formal interrogation back at the police station. <u>Id.</u> at 21:22-23,  According to Officer Carter's testimony at the suppression hearing, Vojtko may have instructed the officers not to ask Ronk any questions. <u>Id.</u> 22:7–23:8.  In any event, Carter and the other officers did not Mirandize the defendant. <u>Id.</u>

At the suppression hearing, Sergeant Michael Huntzinger further explained that he was selected as the "contact officer" for the arrest team, meaning that when Ronk entered the house, Huntzinger would initially place hands on the defendant to take him into custody. <u>Id.</u> at 30:4-8, 39:20–40:2.  As Huntzinger testified, he and three other members of the team went into a specific formation in the living room area as they anticipated Ronk's entry through the front door. <u>Id.</u> at 30:13-16, 32:19–33:4.  For example, Sergeant John Fuches stood to Huntzinger's immediate left "to maintain a protective shield and, potentially, lethal cover, should that become necessary during the arrest." <u>Id.</u> at 32:25–33:2.

The government supplied Officer Carter and Sergeant Huntzinger's bodycam footage from Ronk's arrest for the court's review.  In Carter's bodycam footage, Sergeant Fuches can be observed holding an actual police shield just prior to Ronk's entry into the residence. Chief Maransky stood in the formation

just behind Fuches and Huntzinger and in front of Carter.[3] <u>Carter BWC</u> at 2:27-2:37.

In the bodycam videos, the court can discern additional details about the sting operation and the arrest plan.  From the outside, the residence appeared to be a townhouse unit within a residential neighborhood.  There were other vehicles parked in a driveway shared with adjoining units.  The specific unit used for the arrest appeared lived-in from the outside, including a small garden area around a common front porch.  Although it was daytime, the officers had also left the porch light on near the front door. <u>Id.</u> at 7:15-7:19.

On the other side of the front door, the townhouse was clearly vacant and unfurnished, perhaps an unrented unit.   Inside, the arrest team stood waiting for Ronk's arrival.  The lights were off and heavy curtains blocked daylight from coming through the windows. Officers stood just to the side of an entryway staircase in a position where they would not be immediately seen by a person entering the residence. The front door was unlocked.  Top 40 pop music played in the background.  <u>Id.</u> at 0:00–2:35.

---

[3] When possible, the court cites to the relevant timestamps of the bodycam footage at the end of each paragraph to reduce the number of in-line citations.

### 3. The Arrest

Ronk eventually arrived outside the residence in a white 2011 Hyundai Santa Fe.  Watching a video feed from the surveillance camera, Officer Carter advised the other members of the arrest team about Ronk's arrival and movements toward the front door.  In the moments just before Ronk's entry into the residence, officers were readying in the dark while popular love songs played in the background. Id. at 1:45–2:35

In his bodycam footage, Carter softly relayed Ronk's movements toward the front door, "Still in the car…still in the car…exiting now…taking his time though…still exiting."  After a few seconds, Carter whispered, "He's out of the car and approaching."  Approximately ten seconds later, Ronk opened the front door. Id.  The emotional song lyrics on the bodycam audio were replaced with shouts of, "Police!", "Hands behind your back!", and "Do it now!" Id. at 1:55–2:39.

Sergeant Huntzinger rushed toward Ronk. Chief Maransky and Officer Carter moved forward toward the staircase to assist with restraining the defendant.  Sergeant Fuches stood bracing the police shield. Id. at 2:35-2:39.

On Sergeant Huntzinger's bodycam footage, Ronk took two short steps into the residence holding an energy drink can and car keys in his left hand.  From what may be observed, Huntzinger grabbed Ronk at his shoulders, moved him around in some manner, and brought the defendant from a standing position

down to the floor between the front door and staircase. Ronk laid on the floor on his left side with his knees curled toward his stomach. Defendant made several noises as Huntzinger brought him to the floor and hovered over him, including a long, drawn-out wailing noise and then several short, forceful inhaling sounds. Huntzinger and Chief Maransky took control of defendant's right wrist. Huntzinger BWC at 2:40-2:50.

As Ronk whimpered on the floor, Chief Maransky commanded, "Relax. Relax. Relax. Just listen." Sergeant Huntzinger also told defendant, "Listen." Ronk's expressions changed. His noises became words. He answered, "I'm listening." When Huntzinger then provided further instructions to the defendant, Ronk verbalized, "Okay." Thereafter, Huntzinger ordered the defendant to roll onto his stomach. With officers still holding him, Ronk complied, moving into a prone position near the first step of the staircase. Id. at 2:47–2:59.

At this moment in Carter's bodycam footage, Chief Maransky can be observed attempting to secure Ronk's right wrist behind his back. Sergeant Huntzinger knelt over the defendant and attempted to secure his left hand. Id. On the command to roll over, Ronk tried to keep officers from securing his left hand. As Officer Carter leaned in to assist Huntzinger with Ronk's left hand, the defendant grunted, "I fucking knew it." In saying this, Ronk pulled his left hand away from Huntzinger's grasp. Huntzinger's left arm grazed the side of Ronk's

head as he reached to resecure the defendant's left hand. <u>Carter BWC</u> at 2:50-2:57.

On Sergeant Huntzinger's bodycam, the above details are obscured. From this angle, Ronk's left arm came back into view as Huntzinger pulled it behind his back. In response, defendant shouted, "Okay, okay, okay!" Thereafter, Chief Maransky advised Ronk several times to relax. <u>Id.</u> On Huntzinger's bodycam footage, Officer Carter can be observed stepping over Ronk's head to move up onto the staircase to aid in securing the defendant. <u>Id.</u>  <u>Huntzinger BWC</u> at 2:58-3:05.

Sergeant Huntzinger then reached for his handcuffs while Chief Maransky secured Ronk's wrists and Officer Carter pressed down on Ronk's left shoulder. As the first clicking noises of locking handcuffs can be heard, Ronk muttered, "I was coming to see her, not the kid." In response, Huntzinger yelled, "Enough!" and continued to give Ronk instructions so the cuffs could be locked on his right wrist. <u>Carter BWC</u> at 3:00-3:15.

Subsequently, Sergeant Huntzinger and Chief Maransky guided Ronk up from the floor into a standing position. Ronk's eyeglasses had fallen off in the officer's efforts to secure his left wrist. As Ronk came up into a standing position, he requested his glasses. <u>Id.</u> Huntzinger replied, "Hold on. Walk that way," and

escorted Ronk into the vacant living room of the residence with Maransky. Id.
3:15-3:37.

### 3. The Search Incident to the Arrest

As Ronk was led away from the staircase, Officer Carter radioed the county
communications center and followed behind the other members of the arrest
team. Sergeant Fuches set down his police shield, walked to the other side of
the living room, and turned on a ceiling light. Carter also walked into the living
room, going to the other front corner of the unit where Fuches had set down the
shield. The county comm-center responded to Carter's transmission. Carter
turned his body in the direction of the defendant. Defendant turned his head to
look in Carter's direction. Carter radioed, "KT-17 to county, we'll have one male
in custody. 17 to 14, you want a roll down?"

At this point, Ronk turned his glance away from Carter and toward the
undecorated wall. Defendant remarked, "I should've — I should've fuckin' known
better." Based on a radio response from another officer, Carter then contacted
the county comm-center to dispatch a tow truck to the address of the residence.
Id. at 3:37-4:28.

Sergeant Huntzinger and Chief Maransky had moved Ronk into the area
under the light fixture to conduct a search incident to the arrest. Under the light,

Huntzinger searched Ronk's pockets as Maransky held the defendant by the handcuffs. Id. at 4:28-4:53.

Backing up in the timeline and turning to a review of Sergeant Huntzinger's bodycam footage, the search began with Huntzinger lifting up Ronk's auto-racing shirt to inspect the waistband area of the defendant's camouflage cargo shorts. In response, defendant remarked, "I'm not going to do anything wrong." As Huntzinger grabbed the outside of Ronk's right front pocket, the defendant remarked, "Just condoms." Huntzinger asked, "Which pocket?" Huntzinger reached for the defendant's right side cargo pocket. Ronk remarked, "That one right there." When Huntzinger pulled out a box of condoms, Ronk stated, "That's it." Similarly, on the left side, Ronk remarked, "My wallet," when Huntzinger grabbed his shorts pocket from the outside. Huntzinger BWC at 4:08-4:43.

Thereafter, Officer Carter began collecting the items retrieved from the defendant's pockets, including the condom box and wallet. Carter pulled a New York State drivers' license from the wallet. Id. Beneath it was a Social Security card. Carter BWC at 4:53-5:10.

Officer Carter then walked in the direction of the front door, encountering Officer Sam Van Horn, appearing for the first time in the bodycam videos. Carter asked Van Horn if he had an evidence bag. Van Horn replied in the negative. As Carter went to exit the residence, Van Horn called Carter back in. Van Horn had

discovered a bottle of personal lubricant behind the door.  "Did not even see that," Carter remarked.  Carter added the bottle to a collection of evidentiary items in his hands. Id. at 5:10-6:00

While the above occurred, Sergeant Huntzinger and Chief Maransky were loosening the handcuffs at Ronk's request. Subsequently, they moved the defendant out of the residence toward the back of an unmarked police car.  Ronk requested his glasses again.  Huntzinger responded, "We'll get there. We'll get there." Huntzinger BWC at 5:00–6:41

Officer Carter walked back up to the transport vehicle from the direction of the defendant's vehicle as Huntzinger finished those remarks. Chief Maransky handed Carter the defendant's eyeglasses. Carter BWC at 6:25-6:35.

### 4. Transporting the Defendant to the Police Station

Sergeant Huntzinger guided Ronk into the passenger side backseat of the police vehicle, stating, "Step in. Watch your head getting in."  Huntzinger grabbed a seat belt to secure the defendant.  He then stated, "Everything in the back of the car is recorded audio and visual, okay?"  As Huntzinger continued fastening the seatbelt, Ronk stated, "Mm hmm, I'm not going to do anything stupid…I been through this before." Id.  Huntzinger remarked, "Gotcha," as Ronk continued uninterrupted, "I should've known better. I should've." Huntzinger BWC at 6:41-7:00.

14

In Officer Carter's bodycam video, he can be observed placing a wallet, a cell phone, Ronk's driver's license, the box of condoms, and the bottle of lubricant on the front passenger side car mat.  After Ronk had finished making the above statements to Huntzinger, Carter stood up, turned around, and remarked to Officer Van Horn, "Those three things are the condoms, the phone, and the lube."  Sergeant Huntzinger closed the back seat door. Carter BWC at 6:41-6:57.

Officer Van Horn and Officer Carter then transported Ronk from the residence to the police station.  The drive lasted approximately five minutes with mostly silence from the officers and from the defendant. Id. at 8:17–13:39.

Less than two minutes into the drive, as they waited for the traffic light at an intersection, Ronk asked, "What happens to my car?" Id. at 9:35–9:42.  Carter explained from the front passenger seat, "It will be taken to our station, a search warrant will be executed on it, and then it will go to the impound lot." Id. at 9:42–9:50.

Ronk responded, "How much will it cost to get it out, anything?  Well, obviously it's going to be a price… " Carter replied, "It'll be quite a – quite a buck probably." Id. at 9:50–10:00.

Ronk sighed. The traffic light turned green. The officers continued transporting defendant to the police station. Ronk did not say anything audible on the remainder of the footage supplied to the court.  Id. 10:00–13:39.

### 5. *Defendant's Arguments*

Ronk moves to suppress his statements from his arrest as the fruit of custodial interrogation, which were not preceded by Miranda warnings.  Based on the arresting officers' lack of express questioning, the court must decide whether defendant's statements were made in response to the functional equivalent of interrogation as recognized in Innis.[4]

**Standard of Review**

The Fifth Amendment to the United States Constitution provides, among other things, that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. AMEND. V.  The privilege provided by the Self-Incrimination Clause "protects individuals not only from legal compulsion to testify in a criminal courtroom but also from 'informal compulsion exerted by law-enforcement officers during in-custody questioning.' " Pennsylvania v. Muniz, 496 U.S. 582, 589 (1990) (quoting Miranda, 384 U.S. at 461).

---

[4] The court has jurisdiction pursuant to 18 U.S.C. § 3231 ("The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States.").

To give force to this protection from compelled self-incrimination, <u>Miranda</u> established procedural safeguards requiring police to advise criminal suspects of their rights before commencing custodial interrogation, i.e., what are commonly called <u>Miranda</u> warnings. <u>See</u> <u>Florida v. Powell</u>, 559 U.S. 50, 59–60 (2010). Specifically:

> Prior to any questioning, the person must be warned that he has the right a remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

<u>Miranda</u>, 384 U.S. at 444.

The Supreme Court has further described <u>Miranda</u> warnings as "a set of prophylactic measures to protect a suspect's Fifth Amendment right from the 'inherently compelling pressures' of custodial interrogation." <u>Maryland v. Shatzer</u>, 559 U.S. 98, 103 (2010) (quoting <u>Miranda</u>, 384 U.S. at 467).  "Unless a suspect 'voluntarily, knowingly and intelligently' waives these rights…any incriminating responses to questioning may not be introduced into evidence in the prosecution's case in chief in a subsequent criminal proceeding." <u>Muniz</u>, 496 U.S. at 589 (quoting <u>Miranda</u>, 384 U.S. at 444).  Incriminating responses include both inculpatory and exculpatory responses that the prosecution may seek to introduce at trial. <u>Innis</u>, 446 U.S. at 301 n. 5.

"A defendant's statements made in the course of a custodial interrogation are not admissible as evidence unless the defendant received appropriate warnings, or an exception applies." United States v. Leese, 176 F.3d 740, 743 (3d Cir. 1999).  The applicable burden of proof on a suppression motion begins with the defendant, who must establish a factual basis for a suppression hearing. United States v. Voigt, 89 F.3d 1050, 1067 (3d Cir. 1996). Once the defendant makes that showing, the burden rests upon the government to prove, by a preponderance of the evidence, that the challenged evidence is admissible. See United States v. Matlock, 415 U.S. 164, 177 (1974). "[T]he determination whether statements are the product of such 'custodial interrogation' must be made on a case-by-case basis." United States v. Mesa, 638 F.2d 582, 584 (3d Cir. 1980).

**Analysis**

**1. Custody**

The prerequisite for the application of Miranda safeguards is the concurrence of two factors: "in custody" and "interrogation." United States v. Dupree, 617 F.3d 724, 731 n. 7 (3d Cir. 2010).  "In determining whether an individual is in custody, the ultimate inquiry is: 'whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest.'" Leese, 176 F.3d at 743 (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983); Oregon v. Mathiason, 429 U.S. 492, 495, (1977)).

18

The government concedes that Ronk was in custody at the time he made any incriminating statements.

2. **Interrogation**

According to the operational plan, members of the arrest team did not provide the defendant with <u>Miranda</u> warnings or ask any "interrogation questions." Rather, Officer Vojtko, the undercover agent who had been communicating with Ronk, planned to formally interrogate the defendant at the police station.

Yet, "the <u>Miranda</u> safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." <u>Innis</u>, 446 U.S. at 300–01. The "functional equivalent" of interrogation includes "any words or actions on the part of the police…that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Id.</u> at 301.

The "functional equivalent" definition "focuses primarily upon the perceptions of the suspect, rather than the intent of the police," reflecting that "the <u>Miranda</u> safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police." <u>Id.</u> "A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." <u>Id.</u> Accordingly, "[c]oercion is [also]

19

determined from the perspective of the suspect."[5] <u>Illinois v. Perkins</u>, 496 U.S. 292, 296 (1990) (citing <u>Innis</u>, 446 U.S. at 301).

Pursuant to <u>Innis</u>, "not...all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation." 446 U.S. at 299–300. The functional equivalent of interrogation does not include any words or actions on the part of the police that are "normally attendant to arrest and custody[.]" <u>Id.</u> at 300–01. Additionally, the "police may not...be held accountable for the unforeseeable results of their words or actions." <u>Brownlee</u>, 454 F.3d at 146 (quoting <u>Innis</u>, 446 U.S. at 302) (cleaned up). To constitute an interrogation, officer conduct "must reflect a measure of compulsion above and beyond that inherent in custody itself." <u>Innis</u>, 446 U.S. at 300 (footnote omitted). Moreover, "[v]olunteered statements of any kind are not barred by the Fifth Amendment." <u>Miranda</u>, 384 U.S. at 478.

Considering the above standard, the court carefully reviewed Officer Carter and Sergeant Huntzinger's bodycam videos to determine whether the words or actions of the police were those that are normally attendant to arrest and custody, whether they were designed to capitalize on a surprise arrest, and

---

[5] The intent of a police officer nonetheless remains relevant to the analysis. <u>See</u> <u>United States v. Brownlee</u>, 454 F.3d 131, 147 (3d Cir. 2006) (citing <u>Innis</u>, 446 U.S. at 301 n.7). "In particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect." <u>Innis</u>, 446 U.S. at 301 n.7.

whether the officers should have known of the defendant's particular susceptibilities.

*Statements Initially Made Upon Arrest.* Shortly after Sergeant Huntzinger made physical contact with Ronk at the entry to the residence and brought him down to the floor, the defendant made three statements.  First, Ronk said, "I fucking knew it."  He followed up with, "okay, okay, okay."  Less than ten seconds later, Ronk said, "I was coming to see her, not the kid."

Defendant argues that the "carefully thought-out" police tactics in this case led to "predictable results[.]" (Doc. 53, Def. Post-Hearing Br. at 2).  He asserts that the officers created "an atmosphere which elicited incriminating remarks." Id. at 6–7.  The government contends that Ronk spontaneously volunteered these statements as the officers said and did things associated with a typical arrest, i.e., physically restraining the defendant and applying handcuffs. (Doc. 52, Def. Post-Hearing Br. at 6–7).  After careful review of the bodycam footage, the court agrees with the government's position.

When it imposed the requirement of warnings in Miranda, the United States Supreme Court was concerned with "a variety of psychological ploys." Arizona v. Mauro, 481 U.S. 520, 526 (1987) (quoting Miranda, 384 U.S. at 450, 457; Innis, 466 U.S. at 299).  Those ploys involved positing the guilt of the subject, minimizing the moral seriousness of the offense, and casting blame on the victim

or on society.  Id.  When "coupled with the interrogation environment," the Supreme Court determined that such ploys were "likely to subjugate the individual to the will of his examiner and thereby undermine the privilege against compulsory self-incrimination." Id.  However, "subtle compulsion" is not interrogation requiring Miranda warnings. Id. at 528–29 (citing Innis, 446 U.S. at 303).  Furthermore, "[p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within Miranda's concerns." Perkins, 496 U.S. at 297 (citations omitted).

The "functional equivalent" test looks at the "perceptions of the suspect, rather than the intent of the police." Innis, 446 U.S. at 301.  In this case, the Kingston Township Police Department used several artifices to effectuate an arrest.  They relied on the appearances of a townhouse neighborhood and a unit that appeared to be lived-in from the outside.  They furthered that ruse by playing an emotional love song as Ronk exited his vehicle and entered the residence. When Ronk crossed the threshold into the house, the lights were off, and heavy curtains blocked daylight from coming through the windows.  Officers were positioned in a manner where they would not be immediately visible when opening the front door.  When Ronk opened the door to the residence, all the police pretenses up to that point culminated in a surprise, high-force arrest.

Ronk initially wailed and made whimpering noises.  These initial noises are not dispositive facts, however.  From review of the bodycam videos, Ronk "showed no signs of being emotionally upset or overwrought[,]" once he realized that he had been physically detained by police officers.  United States v. Calisto, 838 F.2d 711, 718 (3d Cir. 1988).  That is, Ronk's demeanor changed quickly. He stopped whimpering.  In response to officer commands of "Relax," and "Listen," Ronk more calmly told the officers, "I'm Listening," and "Okay."  When defendant said, "I fucking knew it," he was no longer behaving in a scared or surprised manner.  Rather, he had just followed police commands to roll over and was making grunting noises as the result of rolling onto his knees while being physically held by the officers.  Ronk was also in the process of intentionally or unintentionally pulling his left hand away from Sergeant Huntzinger's grasp.

From the court's review of defendant's actions, and the tenor and tone of his voice, any initial surprise created by the style of the arrest had thoroughly dissipated by the time he said, "I fucking knew it."  Contrary to his arguments, Ronk did not make this statement in response to the surprise arrest, or the efforts officers made to conceal the residence as a sting house.  Instead, Ronk voluntarily made this statement in response to officer words and actions attendant to arrest. See Muniz, 496 U.S. at 603 (holding that officer instructions "were not likely to be perceived as calling for any verbal response and therefore

23

were not 'words or actions' constituting custodial interrogation"). Thus, Ronk's statement of "I fucking knew it," will not be suppressed.

Shortly thereafter, in trying to re-secure Ronk's left hand, Sergeant Huntzinger grabbed the defendant's hand and pulled the defendant's arm behind his back. In doing so, Huntzinger grazed the defendant's head with his arm. Ronk said, "Okay, okay, okay," in response to the officer's efforts. In this context, the repeating of the word "okay" is not an incriminating response to the functional equivalent of interrogation. Rather, this statement amounts to defendant's response to officer force and physical restraints to further an arrest. This statement will also not be suppressed.

Next, Ronk said, "I was coming to see her, not the kid." In context, the defendant made this statement after officers provided him with instructions so they could apply handcuffs, and nothing else. Those words from the police are attendant to the defendant's arrest. Ronk's statement was immediately preceded by the sounds of handcuffs being clicked onto one of his wrists. Handcuffing a suspect is a police action normally attendant to arrest. Thus, Ronk's statement of "I was coming to see her, not the kid," will not be suppressed.

The officers' conduct during the initial process of securing the defendant were routine procedures related to officer safety and control of the scene, not

words and actions meant to further the procurement of testimonial evidence.[6]

Thus, all the statements made by Ronk to this point were made spontaneously

and voluntarily in response to words and actions normally attendant to arrest and

custody.

> _Statements Made During the Search Incident to Arrest._  Next, Sergeant

Huntzinger and Chief Maransky moved Ronk to a larger living room area.  In that

area, Officer Carter radioed into a communications center that the officers had

"one male in custody."  Defendant then remarked, "I should've — I should've

fuckin' known better."

> Ronk argues that "[f]urther announcing that he was in custody on a radio

was perceived by [the defendant] as requiring a response." (Doc. 52, Def. Post

Hearing Br. at 8).  The court disagrees.

> The act of calling in an arrest over a police radio serves a purely

administrative function—notifying the county communications center, confirming

the suspect's status, and logging information.  See Muniz, 496 U.S. at 601–02

---

[6] After Ronk said, "I was coming to see her, not the kid," Sergeant Huntzinger yelled, "Enough!" and continued making further commands relative to handcuffing the defendant. Huntzinger testified that he intended to communicate, "quit talking." (Doc. 51, H.T. at 36:2-7). Ronk argues that Huntzinger should have provided him with Miranda warnings instead of demanding silence. (Id. at 51:5-14)  From the court's perspective, however, Sergeant Huntzinger's decision to yell "Enough!" in response to Ronk's statements was an active intervention to discourage the defendant from speaking.  Such a statement objectively refutes any contention that the police officers were attempting to exploit the environment to gain unwarned admissions.

(determining that biographical questions asked of a suspect at a booking center were reasonably related to police administrative concerns falling outside of the protections of <u>Miranda</u>).  In review of the bodycam footage, Officer Carter's transmission contained only routine police jargon and administrative details. [7] Carter did not relay any narrative of the arrest, use the defendant's name, or refer to any inflammatory information such as information from the online chats, the severity of the charges, or evidence found on the scene.  In the absence of evidence of intentional provocation, Ronk's remark, "I should've — I should've fuckin' known better," is best understood as a spontaneous reaction to unavoidable administrative action by the police, i.e., words and actions attendant to defendant's arrest and custody.  Therefore, this statement will not be suppressed.

A moment later, Sergeant Huntzinger and Chief Maransky moved Ronk into a different area of the living room to conduct the search incident to arrest. Ronk argues that Huntzinger's conduct caused him to make a statement that an object in his pocket was, "Just condoms."  According to the defendant, Huntzinger paused the search and glanced at him.  Ronk argues this pause and

---

[7] Officer Carter did say "17 to 14" at one point of the radio transmission.  This sentence fragment had nothing to do with the ages of any real or fictitious victim in this case.  Rather, in context, "17 to 14" meant "Officer 17 to Officer 14."  In context, Carter was making a transmission to another police officer to ask whether that officer wanted a "roll back" tow truck for the defendant's vehicle.

glance was also the functional equivalent of express questioning requiring suppression of his statement.

Defendant's legal argument is not compelling. A search incident to arrest is a routine, non-testimonial procedure justified by governmental interests in officer safety and preventing the destruction of evidence. Like handcuffing, this procedure is "normally attendant to arrest and custody[.]" <u>Innis</u>, 446 U.S. at 301. The Sixth Circuit Court of Appeals has further determined that "police questioning isn't an 'interrogation' when an officer asks about information 'he was already entitled to know' through a search incident to arrest." <u>United States v. Lester</u>, 98 F.4th 768, 773 (6th Cir. 2024) (quoting <u>United States v. Woods</u>, 711 F.3d 737, 741 (6th Cir. 2013)). Since Sergeant Huntzinger would have found a box of condoms in Ronk's pocket anyway, <u>Lester</u> and <u>Woods</u> are persuasive.

Additionally, the bodycam footage dispels any factual basis for Ronk's argument. As Huntzinger began to check under Ronk's shirt around his belt, the defendant remarked, "I'm not going to do anything wrong." <u>Huntzinger BWC</u> at 4:08-4:15. As Huntzinger grabbed the outside of Ronk's right front pocket, the defendant remarked, "Just condoms." <u>Id.</u> at 4:15-4:24. Huntzinger asked, "Which pocket?" Then, as Huntzinger reached for the defendant's right side cargo pocket, Ronk remarked, "That one right there." When Huntzinger pulled out a box of condoms, Ronk stated, "That's it." <u>Id.</u> Similarly, on the left side, Ronk

remarked, "My wallet," when Huntzinger grabbed the area from the outside. Id. at 4:24-4:43.  Neither bodycam video supplied to the court corroborates Ronk's assertion that Sergeant Huntzinger glanced at him or even paused the search.[8] In this portion of the encounter, Huntzinger's bodycam footage angles downward toward the floor, suggesting that he was hunched over during the time Ronk made the above statement about the condoms.  The video comports with Huntzinger's testimony that he was looking at where his hands were going when conducting the search. (Doc. 51, N.T. at 44:17-23).  Consequently, Ronk's statements during that search will not be suppressed, including his utterance of, "Just condoms."

 *Statements Made During Transport.*  After the search, Sergeant Huntzinger and Chief Maransky loosened Ronk's handcuffs at the defendant's request. Officer Carter began collecting evidence, that is, essentially all the items in defendant's hands and pockets when he entered the residence.  As reflected in the bodycam video, the officers may have planned Ronk's arrest in some detail, but they did not remember to bring any evidence bags.  Thus, Carter exited the residence holding all these items in his hands to conduct a plain view search of the outside of defendant's Hyundai.

---

[8] Officer Carter's bodycam footage indicates that he was facing away from the search in the opposite part of the living room at the time defendant made the statement about the condoms.

Officer Carter and Sergeant Huntzinger's bodycams then reconverged outside the residence as Huntzinger and Chief Maransky escorted the defendant to the transport vehicle.  Huntzinger's bodycam shows Carter holding several items in his hands.  Carter's bodycam shows that those items include the bottle of lubricant and the box of condoms.

As Sergeant Huntzinger secured defendant in the backseat, he said to Ronk, "Everything in the back of the car is recorded audio and visual, okay?" Huntzinger BWC at 6:44-7:00.[9]  Ronk replied, "Mm hmm, I'm not going to do anything stupid…I been through this before." Id.  As Huntzinger remarked, "Gotcha," Ronk continued, "I should've known better. I should've." Id.

Ronk argues that Officer Carter's actions coupled with Sergeant Huntzinger's words amounted to the functional equivalent of interrogation and that the above statements should be suppressed due to the officer's failure to provide Miranda warnings. (Doc. 53 at 9).   On this point, the court agrees.

"Custodial interrogation for purposes of Miranda includes both express questioning and words or actions that, given the officer's knowledge of any special susceptibilities of the suspect, the officer knows or reasonably should know are likely to have the force of a question on the accused." Muniz, 496 U.S.

---

[9] The court concludes that the notification took the form of a declarative question.  This type of question is a statement spoken with an intonation at the end and is meant to seek a response.

at 601 (cleaned up).  "A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." Innis, 446 U.S. at 301.  "Any knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect." Id. at 302 n.8.

At this point in Ronk's custody, Sergeant Huntzinger had been next to the defendant as he had made several inculpatory and exculpatory statements over the previous five minutes.  Ronk made comments in response to being physically restrained and handcuffed.  Sergeant Huntzinger responded to those comments by communicating "Enough!" or quit talking.  Ronk had also responded to a police radio transmission with an incriminating remark and freely told officers what was in his pockets during a search incident to his arrest.  Ronk was a chatty arrestee.  Huntzinger thus should have known his remark about recording would be reasonably likely to elicit an incriminating response from this "peculiarly susceptible" defendant, especially since it took the form of a question. Id. at 302. Huntzinger should have known, by this point, that this question was "particularly 'evocative.' " Id. at 303.

The court recognizes that notice to Ronk about recording may derive from a custody-related administrative procedure with an important rationale. Moreover, the record in no way suggests that Sergeant Huntzinger's words to the defendant were intentionally designed to elicit a response. Innis, however, sets forth an objective standard. See 446 U.S. at 305 (Marshall, J, dissenting); Michigan v. Bryant, 562 U.S. 344, 360 n. 7 (2011); Davis v. Washington, 547 U.S. 813, 839 n.4 (2006) (Thomas, J., concurring in part). That objective standard requires suppression.[10]

Thus, Ronk's statements in the back of the transport vehicle, "Mm hmm, I'm not going to do anything stupid…I been through this before, " and "I should've known better. I should've," will be suppressed. These are the only statements that will be suppressed.[11] Otherwise, defendant's motion to suppress will be denied.

---

[10] The government did not probe this area during Huntzinger's testimony. In that sense, they failed to meet their burden that this statement about recording was "normally attendant to arrest and custody." Moreover, officers did not make a special point to advise Ronk that he was being recorded by at least two police bodycams during his arrest. If Huntzinger was required by department policy to tell Ronk that he was being recorded in the back of the unmarked police car, he did not similarly advise the defendant about the bodycams. There is no indication that Ronk knew, at that time, that the whole arrest had been recorded.

[11] Ronk's subsequent questions to the officers as they drove to the police station only pertain to administrative-type concerns about his car being impounded and not the alleged crimes or the evidence against him. Since defendant's questions and statements about his car were initiated by him and Officer Carter did not say anything reasonably likely to elicit an incriminating response, defendant's statements during active transport will not be suppressed.

### ***Defendant's Motion to Dismiss***

Turning to Ronk's motion to dismiss, he challenges the legal application of 18 U.S.C. § 2260A to his charges based on allegations that defendant "believed" that the minor involved was an actual minor, not an undercover officer. (Doc. 36). To reiterate, on July 30, 2024, a grand jury in the Middle District of Pennsylvania returned an indictment charging Ronk with the following crimes:

- **Count 1** – attempted online enticement of a minor in violation of 18 U.S.C. § 2422(b);

- **Count 2** - attempted transfer of obscene materials to a minor in violation of 18 U.S.C. § 1470

- **Count 3** – interstate travel to engage in illicit conduct with a minor in violation of 18 U.S.C. § 2423(b).

- **Counts 4 to 6** - committing a felony offense involving a minor while registered as a sex offender in violation of 18 U.S.C. § 2260A.

(Doc. 1).

Ronk is alleged to have violated 18 U.S.C. §§ 2422(b) and 2423(b) in Counts 1 and 3 by targeting his offense conduct at an individual who he "believed had not attained the age of 18 years." Id. at 1, 3. In Count 2, Ronk allegedly violated 18 U.S.C. § 1470 by directing his offense conduct at an individual who he "believed had not attained the age of 16 years." Id. at 2.

Defendant argues that the Section 2260A offenses are legally deficient because the underlying offense conducts in Counts 1 through 3 did not involve

an actual minor, but an individual believed to be a minor. Thus, Ronk seeks dismissal of the Section 2260A charges pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v) for failure to state an offense.

To date, the Third Circuit Court of Appeals has not addressed the issues raised by the defendant. After a review of Section 2260A, and upon consideration of other circuit-level decisions, Ronk's motion to dismiss will be denied.

**Standard of Review**

Rule 12(b)(3)(B) allows a district court to review the sufficiency of the government's pleadings to ensure that legally deficient charges do not go to a jury. United States v. Bergrin, 650 F.3d 257, 268 (3d Cir. 2011). In considering the motion to dismiss, the court must accept as true the factual allegations set forth in the indictment and consider only the facts alleged therein. See United States v. Vitillo, 490 F.3d 314, 321 (3d Cir. 2007); United States v. Besmajian, 910 F.2d 1153, 1154 (3d Cir. 1990). Consequently, the court does not consider matters extraneous to the indictment offered by the government in its opposition brief. The court also sets aside all facts made known to the court during the evidentiary hearing on defendant's motion to suppress.

**Analysis**

When registered sex offenders commit certain enumerated felonies "involving a minor," Section 2260A establishes enhanced penalties, i.e., an additional 10 years of imprisonment. 18 U.S.C. § 2260A.  That 10-year sentence must be served consecutively to any sentence imposed for the underlying offense. Id.

The felonies enumerated in Section 2260A include violations of 18 U.S.C. §§ 1470, 2422, and 2423. Id.  Ronk has been charged with these enumerated offenses in Counts 1 through 3.  In Counts 4 through 6, the government seeks the enhanced penalties under Section 2260A, alleging that Ronk has the requisite sex offender status and that he committed three predicate offenses, in each earlier count, believing that they involved a minor. (Doc. 1 at 3-5).  As charged, Ronk faces decades of additional imprisonment if found guilty of the underlying violations of 18 U.S.C. §§ 1470, 2422, and 2423. [12]

In support of his argument that Section 2260A requires an "actual minor" to be involved in the underlying crimes, Ronk cites United States v. Dahl, 81 F. Supp. 3d 405 (E.D. Pa. 2015), a decision from a sister jurisdiction.  In Dahl, the court concluded that "the language 'involving a minor' in [Section] 2260A applies

---

[12] The government does not oppose Ronk's motion to bifurcate trial on Counts 4 through 6. (Docs. 35, 35-1).

only to situations in which a person under the age of eighteen is involved and not to situations in which an adult undercover agent is posing as an underage person." Id. at 407.  The government counters that Dahl was wrongly decided and their brief in opposition supplies out-of-circuit decisions supporting their position. (Doc. 42 at 18).  Before addressing Dahl or the other appellate-level decisions, the court will undertake its own analysis of 18 U.S.C. § 2260A.

The court begins with the language of the statute itself. Republic of Sudan v. Harrison, 587 U.S. 1, 8 (2019) (citations omitted).  Section 2260A provides, in pertinent part:

> Whoever, being required by Federal or other law to register as a sex offender, commits a felony offense involving a minor under section…1470…2242 [or] 2243…shall be sentenced to a term of imprisonment of 10 years in addition to the imprisonment imposed for the offense under that provision.

18 U.S.C. § 2260A.

Consequently, to establish a violation of Section 2260A, the government must prove beyond a reasonable doubt that: 1) an individual is required by law to register as a sex offender; and 2) that they committed a felony offense "involving a minor" under the enumerated statutes.

Section 2260A is found within Chapter 110 of Title 18.  For the purposes of Chapter 110, the term "minor" means "any person under the age of eighteen years[.]" 18 U.S.C. § 2256(1).  The definition of words in isolation is not

35

necessarily controlling in statutory construction. <u>Dolan v. U.S. Postal Serv.</u>, 546 U.S. 481, 486 (2006)). Here, the word "minor," is one part of a larger participial phrase, that is, "involving a minor." In the structure of Section 2260A, the words "involving a minor" function as an adjective that modifies "offense" along with word "felony" and the list of enumerated statutes. Thus, this dispute centers on the entire participial phrase "involving a minor," not just the word "minor." The word "involving" in the phrase "involving a minor" is not defined in the statute.

When a word like "involving" is not defined within a statute, the court construes it in accordance with its ordinary meaning. <u>United States v. Husmann</u>, 765 F.3d 169, 173 (3d Cir. 2014). Courts look to dictionary definitions to determine the ordinary meaning of a word. <u>Id.</u> (citing <u>United States v. Geiser</u>, 527 F.3d 288, 294 (3d Cir. 2008)). But the court may not do so blindly. <u>United States v. Brown</u>, 740 F.3d 145, 149 (3d Cir. 2014) (quoting <u>FDIC v. Meyer</u>, 510 U.S. 471, 476 (1994)) (cleaned up). That is, "resorting to dictionary definitions may be helpful[,]" however, "the touchstone of statutory analysis should, again, be the statute itself." <u>Id.</u> (citations omitted). "After all, '[a] word in a statute may or may not extend to the outer limits of its definitional possibilities.' " <u>Husmann</u>, 765 F.3d at 173 (quoting <u>Dolan</u>, 546 U.S. at 486). Therefore, "interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose

and context of the statute, and consulting any precedents or authorities that inform the analysis." Id. (cleaned up).

To determine the meaning of "involving" in 18 U.S.C. § 2260A, the court considers "definitions of the term, the statutory context, and the case law." Id. The base word "involve" is a word with various dictionary definitions. See United States v. Chau, 293 F.3d 96, 102 (3d Cir. 2002)  According to Merriam-Webster, those various (non-archaic) definitions include: 1a) "to engage as a participant"; 1b) "to oblige to take part"; 1c) "to occupy (someone, such as oneself) absorbingly *especially* :to commit (someone) emotionally"; 2a) "to have within or as part of itself" as in "include"; 2b) "to require as a necessary accompaniment" as in "entail"; 2c) as in the word "affect"; 3) "to relate closely" as in the word "connect"; and 4) "to surround as if with a wrapping" as in "envelop."[13]

Consequently, such dictionary definitions can have restrictive and broad meanings when applied to the phrase "involving a minor" in 18 U.S.C. § 2260A. Christopher v. United States, 148 F.4th 885, 894 (7th Cir. 2025) (comparing the narrower "to require as a necessary accompaniment" with the broader "to relate closely"). In other contexts, the Third Circuit Court of Appeals has determined that "[t]he plain meaning of 'involve' is 'to relate closely' or to 'connect closely.' "

---

[13] *Involve*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/involve (last updated Oct. 23, 2025 (example sentences)) (last accessed Oct. 28, 2025).

United States v. Daniels, 915 F.3d 148, 153 (3d Cir. 2019) (citing United States

v. Gibbs, 656 F.3d 180, 184–85 (3d Cir. 2011); United States v. McKenney, 450

F.3d 39, 43 (1st Cir. 2006); Webster's Third New International Dictionary 1191

(1993); The American Heritage Dictionary 921 (4th ed. 2000)). Specifically,

when used in the context of the Armed Career Criminal Act ("ACCA"), 18 U.S.C.

§ 924(e), "involving" takes on a broad meaning and encompasses attempt

crimes. Daniels, 915 F.3d at 157 (discussing 18 U.S.C. § 924(e)(2)(A)(i)).

Although a shortcut to a conclusion now emerges, the court will not blindly

apply the "to relate closely" definition from the dictionary. See Alli v. Decker, 650

F.3d 1007, 1016 (3d Cir. 2011) ("over-reliance on dictionaries—to the exclusion

of sources such as adjacent statutory provisions—can lead a court astray.").

Furthermore, although it makes for a compelling argument, the court will not

apply the "plain meaning" of "involving" in 18 U.S.C. § 924(e)(2)(A)(i) to 18

U.S.C. § 2660A because "[w]hen Congress writes, context matters," see Clean

Air Council v. United States Steel Corp., 4 F.4th 204, 206 (3d Cir. 2021), and

these two statutes address different legislative concerns. Rather, the analysis

moves a consideration of the specific purpose and specific context of Section

2660A.

Section 2260A was added to Chapter 110 of Title 18 by the Adam Walsh

Child Protection and Safety Act of 2006 ("Adam Walsh Act"). Pub. L No. 109–

38

248, Title VII, § 702, July 27, 2006, 120 Stat 587.  The 109th Congress passed the Adam Walsh Act "[t]o protect children from sexual exploitation and violent crime, to prevent child abuse and child pornography, to promote Internet safety, and to honor the memory of Adam Walsh and other child crime victims." Id.; see also Bakran v. Sec'y, United States Dep't of Homeland Sec., 894 F.3d 557, 567 (3d Cir. 2018) (collecting cases finding that the Adam Walsh Act was enacted to prevent future harm).

The Adam Walsh Act was enacted, in part, "to close the loopholes in previous sex offender registration legislation and to standardize registration across the states." United States v. Shenandoah, 595 F.3d 151, 154 (3d Cir. 2010), abrogated on other grounds by Reynolds v. United States, 565 U.S. 432 (2012) (footnote omitted). Title I of the Adam Walsh Act contains the originally enacted provisions of the Sex Offender Registration and Notification Act ("SORNA"). Id.

In enacting 18 U.S.C. § 2260A specifically, Congress clearly sought to prevent child sexual exploitation (and honor child crime victims) by imposing a mandatory 10-year consecutive sentence on specific recidivists — individuals, already registered as sex offenders, who committed felony offenses involving children.  Consequently, the purpose and context of the Adam Walsh Act supports a broad meaning of "involving" within in the phrase "involving a minor" in

39

18 U.S.C. § 2260A. <u>See</u> <u>United States v. Slaughter</u>, 708 F.3d 1208, 1216 (11th Cir. 2013) ("We cannot say that this stated purpose would be furthered by treating a recidivist sex offender better simply because he enticed somebody he believed to be a child, rather than an actual child.").

Along those same lines, in April 2003, three years prior to passage of the Adam Walsh Act, Congress amended the Child Pornography Prevention Act of 1996 in response to <u>Ashcroft v. Free Speech Coal.</u>, 535 U.S. 234, 239–40 (2002). <u>See</u> <u>Dahl</u>, 81 F. Supp. 3d at 408. With this piece of legislation, the PROTECT Act of 2003[14], the 108th Congress amended 18 U.S.C. § 2252A, entitled "Certain activities relating to material constituting or containing child pornography." Pub. L No. 108–21, §§ 502–503, 505, April 30, 2003, 117 Stat 650. Specifically, Section 2252A(a)(3) was amended to prohibit the knowing advertising, promoting, presenting, distributing, or soliciting of "a visual depiction of **an actual minor** engaging in sexually explicit conduct[.]" 18 U.S.C. § 2252A(a)(3)(B)(ii) (emphasis added). Section 2252A(c) was also amended to establish the affirmative defense that "the alleged child pornography was not produced using **any actual minor or minors.**" 18 U.S.C. § 2252A(c)(2).

---

[14] The "PROTECT" backronym stands for "Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today."

Congress thus distinguished between "minors" and "actual minors" in Section 2252A.

The PROTECT Act also amended 18 U.S.C. § 2256, cited above, for the definition of the word "minor" in Chapter 110 of Title 18. Pub. L. 108-21, Title V, § 502(a)-(c), April 30, 2003, 117 Stat. 650. Specifically, the PROTECT Act defined the term "indistinguishable" to mean "virtually indistinguishable," in that "the depiction is such that an ordinary person viewing the depiction would conclude that the depiction is of an **actual minor** engaged in sexually explicit conduct." 18 U.S.C. § 2256(11). Thus, the definitional statute relied upon here differentiates between a "minor" and "an actual minor."

Congress's word choice matters. When enacting Section 2260A, Congress chose to use the phrase "involving a minor," not "involving an *actual* minor." Moreover, the definition of "minor" in Section 2260A is taken from a statute, Section 2256, which itself refers to a "minor" and an "actual minor" within its subsections. "When Congress uses a particular phrase in one section of a law but not in another section of the same law, we presume that it included it in one place and excluded it from the other intentionally." Clean Air Council, 4 F.4th at 209 (citing Russello v. United States, 464 U.S. 16, 23 (1983)). Consequently, "it is reasonable to think that Congress would have used 'actual minor' in [Section] 2260A if it wanted to limit the provision's reach to offenses targeting real minors."

Christopher, 148 F.4th at 895 (citing Slaughter, 708 F. 3d at 1216; United States

v. Fortner, 943 F.3d 1007, 1010 (6th Cir. 2019)).  Put another way, the mere

existence of 18 U.S.C. §§ 2252A and 2256 demonstrates that Congress knew

how to limit the application of 18 U.S.C. § 2260A to felony offenses involving an

actual minor but chose not to. See Fortner, 943 F.3d at 1010.  This choice of

verbiage further supports a broader construction of the phrase "involving a minor"

in Section 2260A. See Christopher, 148 F.4th at 894.

Turning next to some other considerations, the word "offense" in Section

2260A is modified by: 1) the word "felony"; 2) the phrase, "involving a minor"; and

3) the list of enumerated felony offenses.  The wide range of predicate felony

offenses listed in Section 2260A support a broad reading of the statute. See

Fortner, 943 F.3d at 1011 ("As a matter of general statutory context, the statute

incorporates many "attempt" crimes in the sixteen enumerated offenses, which

means real victims of any sort frequently are not needed.") (citation omitted).  As

considered in this case, Ronk has been charged with violating 18 U.S.C. § 1470,

18 U.S.C. § 2422(b), and 18 U.S.C. § 2423(b).  To avoid unwarranted

discussion, the court only considers the predicate offenses charged in this case.

Count 1 advances the alleged violation of 18 U.S.C. § 2422(b).  Section

2422(b) provides:

> Whoever, using the…means of interstate or foreign
> commerce…knowingly persuades, induces, entices, or

> coerces any individual who has not attained the age of 18
> years, to engage in prostitution or any sexual activity for
> which any person can be charged with a criminal offense,
> **or attempts to do so**, shall be fined under this title and
> imprisoned not less than 10 years or for life.

18 U.S.C. § 2422(b) (emphasis added).

Ronk has been charged with attempting the offense in Section 2422(b). "[A] conviction under the attempt provision of § 2422(b) does not require the involvement of an actual minor." Tykarsky, 446 F.3d at 469 (citations omitted). Rather, the attempt charge "focuses 'on the subjective intent of the defendant, not the actual age of the victim.' " United States v. Pawlowski, 682 F.3d 205, 211 (3d Cir. 2012) (quoting Tykarsky, 446 F.3d at 466–69). "To prove attempt, the government must show the defendant intended to commit a crime and took a substantial step toward doing so." Id. (citing Tykarsky, 446 F.3d at 469).

"Our criminal law avoids punishing people unless they act with blameworthy intent." United States v. Heinrich, 57 F.4th 154, 157 (3d Cir. 2023). Accordingly, to secure a Section 2422(b) conviction based on attempt, the government must prove beyond a reasonable doubt that the defendant subjectively believed that he was sexually coercing an individual under the age of 18. See Pawlowski, 682 F.3d at 211. Under the law of this circuit, Section 2422(b) permits a conviction based solely on a defendant's belief that the victim was a minor when she was really a law enforcement decoy. Id.

For purposes of 18 U.S.C. § 2260A, such Section 2422(b) "offenses 'involve a minor' even though the target may not be an actual minor." <u>See</u> <u>Christopher</u>, 148 F.4th at 895. Consequently, the Sixth, Seventh, and Eleventh Circuits have concluded that 18 U.S.C. § 2260A "encompasses a defendant's [Section] 2422(b) violation of attempting to entice into criminal sexual activity a law enforcement agent whom the defendant believes to be a minor." <u>Id.</u> (citing <u>Slaughter</u>, 708 F.3d at 1215; <u>Fortner</u>, 943 F.3d at 1009).

Continuing onto the alleged violation of 18 U.S.C. § 2423(b) in Count 3, that subsection provides that:

> A person who travels in interstate commerce…with intent to engage in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both.

18 U.S.C. § 2423(b).

In this statute, "illicit sexual conduct" means, in relevant part, "a sexual act …with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 2423(g). And like Section 2422(b) discussed above, attempted interstate travel with intent to engage in illicit sexual conduct is punishable in the same manner as a completed violation of the statute. 18 U.S.C. § 2423(f).

44

Based on the text of the Section 2423(b), if a defendant travels in interstate commerce with the specific intent to engage in sex acts with a minor, the crime is complete, regardless of whether there was an actual minor involved, or the defendant only believed the individual was a minor. See United States v. Pendleton, 658 F.3d 299, 304 (3d Cir. 2011); Tykarsky, 446 F.3d at 469; see also United States v. Hicks, 457 F.3d 838, 841 (8th Cir. 2006) ("a defendant may be convicted of violating § 2423(b) if he or she travels in interstate commerce with the purpose of engaging in criminal sexual conduct with a person believed to be a minor regardless of whether such person is actually a minor.").

Consequently, there is nothing in Section 2423 to suggest that the enhancement in 18 U.S.C. § 2260A should be limited to crimes involving an actual minor. Rather, the predicate offense charged calls for a broad plain meaning of the word "involving" in the phrase "involving a minor."

There is one last underlying offense to consider in this matter, the alleged violation of 18 U.S.C. § 1470 in Count 2. This statute provides, in pertinent part:

> Whoever, using the…means of interstate or foreign commerce, knowingly transfers obscene matter to another individual who has not attained the age of 16 years, knowing that such other individual has not attained the age of 16 years, **or attempts to do so**, shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 1470 (emphasis added).

45

Although an obscenity statute targeting a different *actus reus*, Section 1470 reads quite a bit like the enticement statute at 18 U.S.C. 2422(b) with respect to attempt.  Again, the enticement statute provides:

> Whoever, using the…means of interstate or foreign commerce…knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, **or attempts to do so**, shall be fined under this title and imprisoned not less than 10 years or for life.

18 U.S.C. § 2422(b) (emphasis added).

Consequently, other federal appellate courts have concluded that no actual minor victim (under age 16) is required for a conviction of attempt to knowingly transfer obscene matter to a minor under Section 1470, applying cases determining that no actual minor victim (under age 18) was required for attempted enticement under 18 U.S.C. 2422(b). United States v. Rudzavice, 586 F.3d 310, 314 & n.10 (5th Cir. 2009) (discussing United States v. Farner, 251 F.3d 510, 511–13 (5th Cir. 2001)); United States v. Spurlock, 495 F.3d 1011, 1013 (8th Cir. 2007) (citing United States v. Helder, 452 F.3d 751 (8th Cir. 2006)); see also United States v. Norrell, 437 F. App'x 881, 883 (11th Cir. 2011) (non-precedential).  These cases are persuasive.  A conviction under the attempt provision of Section 1470 does not require the involvement of an actual minor

under age 16 — more reason to read "involving a minor" broadly in 18 U.S.C. § 2260A.

Dahl thus stands against the above authority in calling for a narrower reading of 18 U.S.C. § 2260A. After consideration of some of the same issues discussed above, the Seventh Circuit relegated the analysis in Dahl to a footnote. Christopher, 148 F.4th at 895, n.4. ("We decline to follow the district court's decision in Dahl, 81 F. Supp. 3d at 405, which focused almost exclusively on the word "minor" without giving much consideration to the entire phrase 'involving a minor.' "). Likewise, the court believes that Dahl focused more on "minor" than "involving" when it determined that "Section 2260A uses the *limiting* words 'involving a minor.' " 81 F. Supp. 3d at 409 (emphasis added).

From this court's standpoint, based on review of the text, purpose, context, and adjacent provisions, the plain meaning of the word "involving" in 18 U.S.C. § 2260A "extend[s] to the outer limits of its definitional possibilities." See Dolan, 546 U.S. at 486. That is, the base word "involve" takes on the dictionary definition of "to relate closely," see Daniels, 915 F.3d at 153, and "involving a minor" in Section 2260A means "relating closely to a minor." Therefore, in this case, the government does not need to allege that the predicate offenses involved an actual minor, only that the offenses related closely to a minor. "Under this definition, the phrase 'involving a minor' does not necessarily mean

that the offense must entail an actual minor; it is more flexible and casts a broader net." <u>Christopher</u>, 148 F.4th at 894.  The definition encompasses alleged crimes where the defendant believed he was directing his conduct toward a child, not a member of law enforcement.  Consequently, Ronk's motion to dismiss Counts 4 through 6 of the indictment will be denied.

### ***Conclusion***

For the reasons set forth in the first part of the memorandum above, Defendant Matthew Ronk's motion to suppress, (Doc. 38), will be granted in part and denied in part.  Defendant's statements in the back of the transport vehicle of "Mm hmm, I'm not going to do anything stupid…I been through this before, " and "I should've known better. I should've," will be suppressed.  Otherwise, the motion to suppress will be denied.

For the reasons detailed in the second part of the memorandum, defendant's motion to dismiss Counts 4 through 6 of the indictment, (Doc. 36), will be denied, as the phrase "involving a minor" in 18 U.S.C. § 2260A encompasses predicate offenses where it is alleged that the defendant believes he is engaging with a minor, but there is no actual minor involved.

Additionally, based on the government's concurrence, defendant's motion to bifurcate trial, (Doc. 35), will be granted.  Counts 1 through 3 will be first tried to a jury and evidence of defendant's sex offender registration status will not be

48

admissible at the first phase of trial absent a further order of court.  An

appropriate order ruling on the above motions follows.  An order scheduling this

matter for trial will be issued thereafter.

Date: _10/30/25_

JUDGE JULIA K. MUNLEY
United States District Court